UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                                :
NED V. MARTIN,                                  :     CASE NO. 4:08-cr-079
                                                :
         Plaintiff,                             :
                                                :
vs.                                             :     OPINION & ORDER
                                                :     [Resolving Doc. 12].
UNITED STATES OF AMERICA                        :
                                                :
         Defendant.                             :
                                                :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this opinion and order, the Court considers the Defendant's motion to suppress ~~his~~ statements he gave on September 17, 2007 and November 15, 2007 and his consent to search his computer. [Doc. 12]. The Defendant alleges that either the FBI agent or the Boardman township police detective should have administered the *Miranda* warnings prior to eliciting his statements and that the search of his computer should be suppressed under a fruit-of-the-poisonous tree theory. The United States responds that the Defendant was not in custody, and therefore under *Miranda* and its progeny, they did not need to issue the warnings. [Doc. 14]. For the reasons stated below, the Court **DENIES** the motion.

**I. Background**

In July 2007, FBI Agent Hartmann received some information from the National Center for Missing and Exploited Children that someone had uploaded videos containing child pornography to

Case No. 4:08-cr-079
Gwin, J.

a website called "photobucket.com." [Tr. at 4].[1/] This website works like an online photo album, and the user who had uploaded or posted the photos to the website had a screen name that was registered to the Defendant, Ned Martin's, email address; Agent Hartmann could not obtain IP address information. [Tr. at 4-5].

To continue the investigation, Agent Hartmann asked Detective Flara of the Boardman township police to accompany her to the Defendant's residence. [Tr. at 9, 46]. On September 19 2007, the two met and drove to the Defendant Martin's apartment, arriving at approximately 8 am. [Tr. at 9]. The Defendant Martin lives in a 6-unit apartment building, the outside door was locked and required someone to ring a buzzer for an individual's apartment. [Tr. at 52]. Agent Hartmann pressed the button to ring the Defendant's apartment. [Tr. at 9] The apartment building does not have a remote entry system, and so the Defendant Martin left his apartment, walked through the common area and down some steps, to answer the door. [Tr. at 52-53].

FBI Agent Hartmann and Detective Flara both testified that they were wearing suits and they displayed their credentials but not their weapons. [Tr. at 9, 39]. Agent Hartmann testified that she said they were investigating a computer crime, [Tr. at 9] and Detective Flara testified that she only asked to speak with him in connection to an investigation. [Tr. at 40]. They both testified that the Defendant agreed to speak with them and that he led them through the common area to his apartment at a normal pace. [Tr. at 40, 48].

The Defendant testified differently. He stated that when he answered the door, Agent Hartmann held it open. [Tr. at 53]. He also testified that Agent Hartmann and Detective Flara had

---

[1/] The Oxford English Dictionary defines to upload as: *2. trans, computing.* To transfer (data, etc.) from one computer or device to another (esp. to one that is larger or remote from the user, or is functioning as a server) *at* http://dictionary.oed.com/

Case No. 4:08-cr-079
Gwin, J.

stated they were there to investigate the Defendant about his potential distribution of child pornography. [Tr. at 53]. The Defendant said that upon hearing this, he freaked out, and turned and ran up the stairs to his apartment. [Tr. at 54]. He stated that he did not realize they were following him. [Tr. at 63-64]. The Defendant further stated that he left the door from the common area to his apartment open, because "there was no one out there." [Tr. at 63-64]. He further testified that he had not given either Agent Hartmann or Detective Flara permission to enter his apartment, but once they did he said nothing. [Tr. at 54, 63].

Once in the apartment, all three witnesses testified that the Defendant Martin said goodbye to his friend Adam, who he had been talking to over a webcam. [Tr. at 13, 41, 54]. To do this, Defendant Martin seated himself at his computer chair. [Tr. at 54]. Defendant Martin testified that it was not until he was seated at his computer chair saying goodbye to Adam, that he realized that Agent Hartmann and Detective Flara had followed him into his apartment. [Tr. at 55]. Defendant Martin further stated that both were at close distances: according to Martin, Agent Hartmann sat herself in a chair no more than three feet from him and Detective Flara stood no more than four feet behind him. [Tr. at 55]. Agent Hartmann and Detective Flara both testified that she sat down in an armchair or loveseat in the apartment that faced him and Detective Flara remained standing, about 10 feet from the Defendant. [Tr. at 11-12, 40-41].

The Defendant Martin testified that he tried to reach for a piece of paper on his desk, next to the computer and one of the agents told him not to touch the paper. [Tr. at 66]. Based on that, he testified that he believed he could not move. [Tr. at 66]. In contrast, Agent Hartmann testified that she did not tell the Defendant not to move his hands, unless one of them asked him not to turn off the computer. [Tr. at 32]. Both Agent Hartmann and Detective Flara further testified that the Defendant

Case No. 4:08-cr-079
Gwin, J.

was free to move in any way, that he did move when Agent Hartman needed access to the computer, and that he chose to move to the couch. [Tr. at 15, 42].

The testimony differed regarding what happened during the conversation as well. The Defendant testified that he "freaked out" and was crying throughout the interview, while Agent Hartmann said he was fine until the end when he asked what would happen next. [Tr. at 33, 56-57]. Agent Hartmann testified that she responded to that question by telling him that he was not under arrest that day. [Tr. at 33-34]. Both Agent Hartmann and Detective Flara stated that the tone of the conversation was very polite. [Tr. at 20, 41-42]. They both further said that the interview lasted not more than one hour and Agent Hartman said that the Defendant Martin confessed to having uploaded the videos containing child pornography early on in the interview. [Tr. at 12, 42].

All witnesses agreed that Agent Hartman asked for Defendant Martin to give his consent that she take his computer and search it, and Defendant Martin gave his consent and signed a form reflecting that consent. [Tr. at 42]. As the Defendant only challenges the consent to search as fruit-of-the-poisonous tree, the Court will not discuss the facts surrounding that consent.

In November, Agent Hartmann testified that she called the Defendant and asked him to come in for an interview on the following day. [Tr. at 18]. The Defendant testified that she said that it would be better for him to come in. [Tr. at 68]. Agent Hartmann testified that she asked the Defendant to come in the following day at 9 am, and that he agreed. [Tr. at 18].

When the Defendant Martin arrived at the FBI offices, Agent Hartmann testified that she told him he was not under arrest and would not be arrested that day. [Tr. at 18]. The Defendant Martin testified that she did not say this to him. [Tr. at 69]. She further testified that the interview lasted approximately one hour and the tone was conversational. [Tr. at 20]. Detective Flara, who also

Case No. 4:08-cr-079
Gwin, J.

attended the interview, testified that neither Agent Hartmann nor he brandished a weapon or placed the Defendant in any restraint on that date. [Tr. at 46].

Agent Hartmann testified that she had mentioned the possibility of a polygraph test during the September interview and that the Defendant Martin indicated he was willing to take such an exam. [Tr. at 19]. At the November interview, however, the Defendant Martin refused to take a polygraph exam and ended the interview with that refusal. [Tr. at 20].

## II. Legal Standard

The Fifth Amendment guarantees that "[no] person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. To protect a defendant's right against self-incrimination during a custodial interrogation, "the accused must be adequately and effectively apprised of his rights [to silence remain silent and to have an attorney present]." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The appraisal must occur Miranda rights must be given "at the outset" of the interrogation. *Id.* at 467.

Police must give the *Miranda* warnings only when they both place a suspect in custody and interrogate that suspect. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. . . . Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will. . .").

After the police issue the *Miranda* warnings, the interrogation may proceed only if the defendant "[waives] effectuation of these rights, provided the waiver is made voluntarily, knowingly

Case No. 4:08-cr-079
Gwin, J.

and intelligently." *Id.* Otherwise, "[if] the individual [invokes his rights] in any manner . . . the interrogation must cease." *Id.* at 473-74.

Courts look to the totality of circumstances in considering whether a defendant was in custody. *United States v. Swanson*, 41 F.3d 524, 528 (6th Cir. 2003). The Court asks how a reasonable man in the Defendant's position would have understood the situation. *Id.* The first factor is whether a reasonable man in the Defendant's position would have felt free to leave or, in a situation where he or she was at home, to end the interview and go about his or her business. *Id.* at 529; *United States v. Protsman*, 74 Fed. Appx. 529, 535 (6th Cir. 2003). The Court also considers:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Swanson*, 41 F.3d at 529 (quoting *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

The Due Process Clause of the Fifth and Fourteenth Amendments also require that all statements offered against a defendant were made voluntarily. *United States v. Patane*, 542 U.S. 630, 631 (2004). In determining whether a defendant's offered-statements were voluntary, the Court "looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). The Sixth Circuit has established "three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.* at 422. As the Supreme Court said in *Berkemer v.*

Case No. 4:08-cr-079
Gwin, J.

*McCarty*, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." 468 U.S. 420 433 n. 20 (1984).

### III. Analysis

I. The Alleged *Miranda* Violations

*A. The September 17, 2007 Interview*

The Court finds the Defendant was not in custody during the September 17, 2007 interview, and therefore not entitled to the *Miranda* warnings.  See *Perkins*, 496 U.S. at 297.  The Court finds the Defendant's testimony that the agents followed him into his apartment without his invitation not credible.  Both Agent Hartmann and Detective Flara testified credibly that the Defendant let them in, led them to his apartment, and that he then exerted control over his situation by choosing his seat and ending an over-the-internet conversation.  The Defendant could have refused entry to the agents. Under these circumstances, the Court finds that a reasonable person in the Defendant's situation would have felt free to end the interview.

The Defendant asserts that Detective Flara told him to not move his hands and he understood he was not free to move about.  The Court does not find this credible.  The Defendant voluntarily moved from the chair by the computer to the couch during the interview–no one directed him to move at that time.  Thus, the Defendant must have felt free to move about while seated in the chair during the interview.  The Court does not find the two agents crowded the Defendant and both sat or stood within four feet of him.  The Court believes the agents' testimony that Detective Flara stood approximately 10 feet away from the Defendant while Agent Hartmann sat in the chair closes to the Defendant.

Case No. 4:08-cr-079
Gwin, J.

The other factors the Court considers also weigh in favor of finding the Defendant was not in custody. While the purpose of the questioning–to determine whether or not it was the Defendant who had uploaded the images–suggests a custodial interview, none of the other factors do. The tone of the interview was conversational and polite, the place of the questioning was not at all coercive, and the questioning did not last more than an hour and the Defendant had admitted to the indicted conduct within minutes of its beginning. *See, e.g.,* [United States v. White, 270 F.3d 356, 366 (6th Cir. 2001)](finding the defendant was not in custody where defendant voluntarily submitted to an interview at his home).

Furthermore, the Defendant was not placed in any restraints such as handcuffs during the interview. *See, e.g.,* [White, 270 F.3d at 366](noting that not placing an individual in handcuffs factors in favor of finding the person was not in custody). For these reasons, the Court finds that the Defendant was not in custody and therefore not entitled to the *Miranda* warnings. *See, e.g. United States v. Jewell,* (finding an hour-long interview in the defendant's kitchen, where the defendant was told he could leave his house but was restricted in his ability to enter the rest of his home his home as it was searched pursuant to a warrant was not a custodial interrogation).

B. The November 15, 2007 Interview

The Court also finds that a reasonable person in the Defendant's position would have felt free to leave at the November interview at the FBI field office. As an initial matter, the Court notes that the Defendant chose to refuse the polygraph exam and end the interview. This is evidence that he did not feel coerced and felt free to leave: he left.

Further, the Court credits Agent Hartmann and Detective Flara's testimony that Agent Hartmann told the Defendant he was not under arrest, would not be under arrest that day, and that

-8-

Case No. 4:08-cr-079
Gwin, J.

he was free to leave at any time. Moreover, while the purpose of the questioning was in connection with an ongoing investigation and Agent Hartmann asked him to come in, all the other factors point toward him not being in custody. For instance, the Defendant came in voluntarily, both Agent Hartmann and Detective Flara testified the tone was cordial, the questioning did not last for more than an hour, the Defendant was informed he was not under arrest, and he experienced unrestrained freedom of movement throughout the interview. For these reasons, the Court finds the November 15, 2007 interview was not a custodial interrogation. *See, e.g.,* Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that the interrogation was noncustodial when defendant voluntarily went to the police station, was informed that he was not under arrest, and was permitted to leave after a thirty-minute interview).

II. The Alleged 14th Amendment Violations

*A. The September 17, 2007 Interview*

Finally, the Court finds both statements voluntary. In the September interview, the Court does not find that Defendant Martin's will was overborne. Two government agents went to his house and asked to speak with him in connection with a computer-crimes investigation, they showed identification but did not brandish any weapons, he led them to his apartment, and exerted control over his situation by choosing where to sit and to end an over-the-internet webcam conversation with a friend. He confessed within a few minutes of the interview beginning, the entire interview lasted less than an hour. This police activity was not objectively coercive, and therefore the statements were not involuntary. *See* Mahan, 190 F.3d at 422.

*B. The November 15, 2007 Interview*

The Court also does not find his will was overborne in the November interview. Agent

Case No. 4:08-cr-079
Gwin, J.

Hartmann telephoned the Defendant and asked him to come to the FBI headquarters for an interview, and she informed the Defendant he was not under arrest when he arrived. This is not objectively coercive police activity. Moreover, the Defendant refused a polygraph test during that interview and ended it. This further demonstrates that the Defendant's will was not overborne. As such, the statements were voluntary. *Id.*

### IV. Conclusion

For the reasons stated above, the Court **DENIES** the Defendant's motion to suppress.

IT IS SO ORDERED.


Dated: April 16, 2008                           s/      *James S. Gwin*
                                                JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE